**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 09 2014, 6:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
G.G., JR.:

**ANA M. QUIRK**
Muncie, Indiana

ATTORNEY FOR APPELLANT
A. S.:

**KRISTIN R. WILLADSEN**
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: ) | |
| ) | |
| G. G. (Minor Child), ) | |
| ) | |
| And ) | |
| ) | |
| A.S. (Mother), & G.G., Jr. (Father), ) | |
| ) | |
| Appellants/Respondents, ) | |
| ) | |
| vs. ) | No. 18A05-1308-JT-418 |
| ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, ) | |
| ) | |
| Appellee/Petitioner. ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT – JUVENILE DIVISION
The Honorable Kimberly S. Dowling, Judge
The Honorable Brian M. Pierce, Magistrate
Cause No. 18C02-1209-JT-19

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

A.S. ("Mother") and G.G., Jr. ("Father") appeal the termination of their parental rights to their son, G.G.[1]  They challenge the sufficiency of the evidence underlying the trial court's termination order.  But G.G.—two years old at the time of the termination hearing—has been in foster care since he was five weeks old, and since that time, his parents have not shown that they can provide a safe and stable home for him.  We conclude that there was sufficient evidence to support the trial court's decision to terminate the parent-child relationship.  We affirm.

## Facts and Procedural History

In May 2011 at the request of the Muncie Police Department, the local Delaware County Department of Child Services ("DCDCS") visited Mother and Father's home.  DCDCS found marijuana plants growing in newborn G.G.'s bedroom, rifle shell casings littering the hallway, and blood spatter and dog feces throughout the home.  DCDCS took custody of G.G. and filed a petition alleging that he was a child in need of services ("CHINS").

G.G. was adjudicated a CHINS.  The trial court issued a dispositional order containing a number of requirements for the parents, with the ultimate goal of

---

[1] As noted, Father is G.G., Jr.  Father's son is G.G. III, but for simplicity we refer to the child as G.G.

reunification. Mother and Father were required to exercise parenting time with G.G., secure suitable housing and stable income, obtain their GEDs, not use drugs and submit to random drug screens, participate in individual and couples counseling, and undergo parenting, substance-abuse, and domestic-violence assessments.

Initially, Mother and Father complied with the trial court's order. They completed the required assessments and participated in some related services, including parenting classes. With the help of DCDCS, Mother rented her own apartment, and DCDCS allowed Mother to have a trial in-home visit with G.G. But this progress was short-lived. Six days into the trial visit, Mother was arrested for shoplifting. G.G. returned to foster care, and Mother was evicted. Mother was later convicted of Class D felony theft and placed on probation for eighteen months.

Around this time, Mother and Father—who had briefly separated—reunited and began living together again. Their relationship was volatile: Mother told caseworkers and G.G.'s foster mother that Father was physically abusive to her. Although the trial court ordered Mother and Father to participate in couples counseling, that never occurred. At the time couples counseling was scheduled to begin, the parents told the counselor that they were no longer dating.

When not in a romantic relationship with Father, Mother moved frequently, sometimes several times in one month. DCDCS brought G.G. to each new address for parenting time. In March 2012 Father stopped attending scheduled parenting time. Tr. p. 58. Later that year, Mother stopped consistently attending counseling. *Id.* at 62. She

3

also resumed living with Father. Neither parent had obtained their GED, and Mother had not maintained a job.

In September 2012 DCDCS filed a petition to terminate Mother's and Father's rights. A hearing on the petition was held in May 2013.

At the hearing, everyone involved in the case expressed concern about Mother and Father's violent relationship. Alisha Nemore, Mother's therapist, described what she characterized as a pattern of domestic violence:

- In summer 2012 Mother stayed at a women's shelter "for a few days." Although Nemore urged Mother to stay at a domestic-violence shelter on multiple occasions, she refused.
- In October 2011 "Mother reported that [Father] hit her."
- Three times, in November 2011, March 2012, and March 2013, Father kicked Mother out of the house.
- An incident "where [Mother] . . . went to the E[mergency] R[oom]. She said, she was pregnant [with another child] at the time . . . and she said she fell in the shower. She had to have stitches . . . ."
- Another incident in February 2013 where Mother "had a gash on her leg that she showed me that was bandaged and she said that she was washing dishes and broke a glass and tried to catch it with her leg."

Id. at 47-51. Mother and Father separated and reunited five times while this case was pending. Id. at 51. At the time of the termination hearing, they had resumed their relationship, and Nemore said she still saw a pattern of domestic violence. Id. at 57.

G.G.'s foster mother had similar concerns. She described an October 2011 incident where Mother:

Had a black eye. . . . [T]hey had a domestic violence incident in the home. [Mother] told me at that time that [Father] had burn[ed] all of her clothes. He had cut up her shoes, had kept her isolated in the home and would not allow her to leave the home.

4

*Id.* at 87. G.G.'s foster mother also recalled times that Mother had bruises, and on another occasion, a broken hand. Mother gave inconsistent explanations for her injuries. *Id.* at 89.

Caseworkers also expressed concern about the instability caused by the parents' legal issues: Father's criminal history includes misdemeanor convictions for battery, criminal mischief, criminal recklessness, public intoxication, and operating a vehicle while intoxicated. State's Exs. 32-36. He also has felony convictions for battery and residential entry, and while this case was pending, he was arrested for operating a vehicle while intoxicated. *Id.*; Tr. p. 32. Mother's criminal history includes two felony theft convictions and a misdemeanor criminal-conversion conviction. State's Exs. 29-31. Both parents were on probation at the time of the termination hearing.

Although Mother and Father completed initial assessments and some services, caseworkers reported that they ultimately failed to comply with the trial court's order. In the two months leading up to the termination hearing, Mother missed eleven of fifteen parenting-time appointments, and when she did attend, she was verbally abusive to the court-appointed special advocate ("CASA") who supervised the parenting time. Tr. p. 45, 70. During that same time, Father did not attend any parenting time. *Id.* at 45. Father never obtained his GED, and his therapist testified that Father simply stopped attending scheduled therapy sessions. *Id.* at 39. Family Case Manager Bethany Allen ("FCM Allen") testified that Mother had not obtained her GED, employment, or suitable housing—Mother moved fourteen times while this case was pending. *Id.* at 92, 103.

FCM Allen recommended terminating Mother's and Father's parental rights. *Id.* at 108.

The CASA echoed FCM Allen's statements, saying:

> In my opinion termination is in the best interests of [G.G.]. [D]espite those services that the parents did complete. . . . [Mother] still has unsuitable housing. She has[] no means of supporting G.G. She continues in a relationship that[—]whenever she's not with Father[—]she . . . admits is unhealthy. The domestic violence continues to be an issue. Both of them continue to have problems with [] staying within the law . . . . [And] I think that [G.G.] is . . . in the home that he's been in for two years and should stay there.

*Id.* at 129-30. G.G.'s foster mother testified that G.G., who was placed with her at five weeks old, was thriving in her home and she and her husband planned to adopt him if Mother's and Father's parental rights were terminated.[2]

In July 2013 the trial court entered its order with findings terminating Mother's and Father's parental rights. Appellant Father's App. p. 68-72.

Mother and Father now appeal.

## Discussion and Decision

On appeal, the parents argue that there is insufficient evidence to support the termination order.[3]

## Termination of Parental Rights

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in

---

[2] Mother and Father were present at the termination hearing, but they did not testify.

[3] Though they filed separate appellate briefs, Mother and Father raise the same legal challenges.

the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Mother and Father challenge the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute.

*A. Conditions Remedied*

8

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCDCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). Because we find it to be dispositive, we address only the arguments regarding subsection (B)(i); that is, whether there was a reasonable probability that the conditions resulting in G.G.'s removal or the reasons for his placement outside the parents' home would be remedied.

When determining if there is a reasonable probability that the conditions that resulted in a child's removal or the reasons for placement outside the home will not be remedied, a trial court must judge a parent's fitness to care for their child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, and failure to provide support. *Id.* The services offered to the parent and the parent's response to those services may also be considered as evidence of whether conditions will be remedied. *Id.*

The trial court concluded that there was a reasonable probability that the conditions resulting in G.G.'s removal from his parents' care or placement outside their home would not be remedied. Appellant Father's App. p. 72. The court expressed concern about the parents' criminal histories and their "deeply disturbing" and "violent and troubled" relationship. *Id.* at 69. Summarizing the parents' conduct during the case,

the court stated that Mother had failed to obtain her GED, maintain a job, secure suitable housing, or "successfully address the pattern of domestic violence." *Id.* at 70. Father, meanwhile, attended only half of his scheduled parenting time, failed to complete his court-ordered therapy, and continued to "demonstrate that he is violent [and] unstable . . . ." *Id.* at 71. The court concluded that "neither parent has demonstrated any benefit from court-ordered services designed to promote reunification" or "indicated a willingness or a desire to change their dysfunctional personal relationship for the sake of maintaining their parental rights." *Id.*

The parents do not dispute any of the trial court's findings; therefore, they stand as proven.[4] Mother points to other evidence—such as her attendance at medical appointments and her continued contact with G.G.'s foster family—and argues that this evidence shows that termination was not appropriate here. *See* Appellant Mother's Br. p. 16. This is an invitation to reweigh the evidence, which we may not do. For his part, Father argues that the conditions resulting in G.G.'s removal "could be remedied given additional counseling between the parties." Appellant Father's Br. p. 20. But Father failed to complete individual counseling, and he and Mother declined couples counseling because they claimed they were no longer in a relationship when that counseling was scheduled to begin. The trial court was within its discretion in concluding that additional counseling would not remedy the conditions leading to G.G.'s removal.

---

[4] "[W]here a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000) (citing *Boyer v. First Nat'l Bank of Kokomo*, 476 N.E.2d 895, 897 (Ind. Ct. App. 1985)).

The evidence supports the conclusion that there was a reasonable probability that the conditions resulting in G.G.'s removal from the parents' care or placement outside their home would not be remedied.

### B.  Best Interests

The parents also contend that termination of their rights is not in G.G.'s best interests.

A determination of what is in the best interests of a child should be based on the totality of the circumstances. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied.*  A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the child's best interests. *Id.* Trial courts need not wait until a child is irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating a parent's rights. *K.T.K.*, 989 N.E.2d at 1235.  Permanency is a central consideration in determining the best interests of a child. *Id.* (citation omitted).

FCM Allen and the CASA assigned to this case testified that Mother and Father are not capable of providing a safe and stable home for G.G., and they recommended terminating their parental rights. Tr. p. 108, 129-30.  Referencing this testimony, the trial court found that termination was in G.G.'s best interests because he "needs a safe, stable, secure, and permanent environment in order to thrive," and "neither parent has shown the ability to provide [G.G.] with such an environment."  Appellant Father's App. p. 71.  The court also noted that G.G. has been in foster care since he was five weeks old, his foster

home is, "for all practical purposes, the . . . only home [G.G.] has [ever] known," and his foster parents plan to adopt him. *Id.* To the extent Father suggests that termination of his (and Mother's) rights was not in G.G.'s best interests because he "had not been harmed in any of the various altercations between his parents," Appellant Father's Br. p. 19, the trial court was not required to wait and see if that would happen. *See K.T.K.*, 989 N.E.2d at 1235.

We conclude that the unchallenged evidence supports the trial court's determination that termination of Mother's and Father's parental rights was in G.G.'s best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).[5]

Affirmed.

RILEY, J., and MAY, J., concur.

---

[5] We share the trial court's concern about the parties' younger child, who is not involved in this case but lived with Mother and Father at the time of the termination hearing. *See* Appellant Father's App. p. 70. At that time, there had been no CHINS filing or court intervention relating to that child, which is troublesome given DCDCS's assertion that Mother and Father are incapable of parenting their older child. However, there is sufficient evidence to support termination of the parents' rights to G.G., and we reject Mother's implication that the current lack of court intervention regarding her younger child somehow negates the evidence pertaining to G.G.